IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 8:17CR193 |
| vs. | **FINDINGS AND RECOMMENDATION** |
| RODNEY LILLARD, | |
| Defendant. | |

This matter is before the Court on Defendant Rodney Lillard's Motion to Suppress Evidence. ([Filing No. 21](#).) Defendant is charged with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). ([Filing No. 1](#).) Defendant seeks to suppress all evidence resulting from the traffic stop and search of his vehicle in Sarpy County, Nebraska on May 30, 2017.

The Court held an evidentiary hearing on October 2, 2017. Defendant was present with his attorney, Denise Frost. The United States was represented by Assistant United States Attorney, Russell Mayer. A transcript (TR.) of the hearing was prepared and filed on November 2, 2017. ([Filing No. 36](#).) This matter is now fully submitted.

## BACKGROUND

At approximately 1:20 a.m. on May 30, 2017, Sarpy County Sheriff's Deputy Earl Johnson ("Deputy Johnson") observed two suspicious vehicles parked in the parking lot of the Nebraska Crossing Outlets, a shopping center located in Sarpy County, Nebraska. (TR. 25.) Sarpy County Sheriff's Deputy Jason Miller ("Deputy Miller"), who was traveling in his own cruiser, assisted Deputy Johnson with the suspicious vehicles. (TR. 28.)

As they were sitting in the parking lot of the Nebraska Crossing Outlets completing their inspection of the suspicious vehicles, the officers observed a blue, 2006 Chevy Equinox drive into the parking lot. At that time, Deputy Miller told Deputy Johnson that this was the third time

he had observed the Equinox drive through the area that day. (TR. 30; 125-26.) The officers thought this was suspicious so they got into their individual cruisers and headed toward the Equinox. (TR. 30-31.) It was later discovered that the Equinox was being operated by Defendant.

The officers observed Defendant make a right-hand turn onto a roadway that contained a median. Deputy Johnson testified that Defendant pulled into the left lane, which placed him on the wrong side of the median. (TR. 32.) Deputy Johnson testified that the lane with the median ended, so Defendant drifted back into the right lane and pulled up to the stop sign at the intersection of Highway 31.[1] As Defendant traveled northbound on Highway 31, the Equinox began to drift and straddle the painted solid line dividing the northbound lane and the turning lane. (TR. 36-37.) At this point, Defendant turned on his turn signal, but never fully entered the turn lane. (TR. 374.) Defendant then made a right-hand turn onto Nebraska Crossing Drive. (TR. 38.) Deputy Johnson testified that Defendant's turn onto Nebraska Crossing Drive was wide and that Defendant turned into the wrong lane. (TR. 38.) As Defendant continued eastbound on Nebraska Crossing Drive, Deputy Johnson decided to stop Defendant and activated his overhead lights. (TR. 38.) However, Defendant did not stop, and continued eastbound on Nebraska Crossing Drive. Defendant eventually slowed the Equinox and made a right-hand turn back into the mall parking lot. (TR. 39-40.) Defendant drove slowly through the parking lot and made a number of turns. (TR. 40.) Defendant ultimately stopped the Equinox in the mall parking lot. However, the Equinox began to pull slightly forward again once it had stopped. (TR. 44.)

Deputy Miller yelled at Defendant to stop the Equinox, and Defendant complied after slightly rolling the vehicle forward. (TR. 43-44.) Deputy Johnson then exited his vehicle and approached the Equinox. (TR. 44.) As he approached, Deputy Johnson yelled at Defendant and told him to exit the vehicle. Defendant complied. (TR. 45.) Deputy Johnson then told Defendant to raise his hands, which Defendant did. (TR. 45.) Deputy Johnson asked Defendant

---

[1] The video of the traffic stop does not reflect that Defendant drove on the wrong side of the median. However, the video does show that Defendant turned into the improper lane and made a lane change without signaling, both in violation of Nebraska law.

what took him so long to stop, and at that point, Defendant lowered his hands and reached for his waistband to pull up his pants. (TR. 45.) Defendant was then placed in handcuffs. (Ex. 2.)

Deputy Johnson testified that when Defendant initially got out of the Equinox, he appeared to be intoxicated. (TR. 45.) Deputy Johnson observed that when Defendant stood up, he was swaying and did not appear to have very good balance. (TR. 45.) Deputy Johnson could smell alcohol on Defendant's breath and noticed that Defendant had bloodshot and glassy eyes. (TR. 45-46.) Deputy Johnson also noted that Defendant's speech was slurred. (TR. 46.) Based on all of this, and Deputy Johnson's experience in arresting more than 230 individuals for driving under the influence of alcohol, Deputy Johnson felt Defendant was under the influence of alcohol. (TR. 47-48.)

After Deputy Johnson handcuffed Defendant, he performed a pat search. (Ex. 2.) Deputy Johnson did not find a wallet on Defendant's person. (TR. 48.) Deputy Johnson did not ask Defendant about a wallet at that time, or ask Defendant his name, but instead opened the driver's door of the Equinox and looked inside to see if the wallet was sitting on the seat or on the floor of the vehicle. (TR. 48-49.) Deputy Johnson looked on the seat but did not see a wallet. (TR. 49.) However, when he opened the door, Deputy Johnson saw an open beer can that was spilled in the center console. (TR 49.) Deputy Johnson testified that he did not see the beer until he opened the door of the Equinox. (TR. 49.) Deputy Johnson went to the passenger side of the Equinox, but still did not locate a wallet. (TR. 50.) Deputy Johnson then walked back around to the driver's side of the Equinox, looked under the driver's seat, and located a firearm. (TR. 50.) Deputy Johnson removed the firearm from the Equinox and placed it on top of Deputy Miller's patrol vehicle. (TR. 50.) Deputy Johnson placed Defendant in the rear of his patrol car. Once Deputy Johnson placed Defendant in the patrol car, he turned off his body microphone to talk to Deputy Miller and call his sergeant.[2] (TR. 54.) Deputy Johnson testified that he did not have probable cause to search the Equinox and Defendant did not provide consent to search. (TR. 63; TR. 65-66.)

---

[2] At some point, Deputy Miller also turned off his microphone. Deputy Miller testified that he shut his microphone off so he could have a private conversation with Deputy Johnson regarding the search of the Equinox. (TR. 111-12.)

At some point following the search of the Equinox, Deputy Johnson asked Defendant his name and Defendant identified himself. (TR. 51; TR. 59-60.) Deputy Johnson could not recall if this was before or after he turned off his microphone.[3] (TR. 51-52.) Between dispatch and the running of Defendant's name through NCJIS, Deputy Johnson leaned that Defendant is a convicted felon, was currently on supervised release, and had two prior DUIs. (TR. 51.) Deputy Johnson gave Defendant a preliminary breath test, after waiting the required 15 minutes, and Defendant tested .150, which is over the legal limit. (TR. 51-52.) Defendant was then told he was being arrested for Driving Under the Influence ("DUI"). He was taken to the Sarpy County jail and charged with possession of a firearm by a prohibited person, DUI third offense, refusal, driving under revocation, carrying a concealed weapon, failure to signal a turn and open alcohol container. (TR. 52-53; Ex. 2.)

Deputy Miller testified at the hearing that he was in charge of the towing and disposition of the Equinox following Defendant's arrest. (TR. 94.) As part of this procedure, Deputy Miller conducted an inventory search of the vehicle. (TR. 94; Ex. 4; Ex. 5.) Per the policy of the Sarpy County Sheriff's Office, Deputy Miller was required to fill out a Tow/Impound Form following completion of the inventory search. (TR. 100.) Deputy Miller testified that he made mistakes on the Tow/Impound Form. (TR. 103.) Specifically, Deputy Miller did not indicate whether Defendant had been arrested. (TR. 103.) He also listed the incorrect model of Defendant's vehicle. (TR. 103.) The Tow/Impound Form also does not list the property found in the vehicle or property removed from the vehicle, although spaces for the listing of such items are contained on the Tow/Impound Form. (Ex. 6.) Deputy Miller testified that pursuant to the policy of the Sarpy County Sheriff's Office, following an inventory search, anything of evidentiary value is listed on an Evidence/Property Form. (TR. 104.) The Evidence/Property Form Deputy Miller completed in this case lists the gun that was found under the driver's seat, but it does not list the beer can observed by Deputy Johnson. (Ex. 7.) Deputy Miller testified that officers in Sarpy County do not take empty or half-empty beer cans into evidence in DUI arrests. (TR. 105-106.)

---

[3] The video reflects that Defendant identified himself before Deputy Johnson turned off his microphone.

Instead, officers flash cans in front of their cameras.[4] (TR. 106.) Deputy Miller testified that he believes he followed the Sarpy County Sheriff's Office's policies and procedures in the way he was trained to conduct inventory searches and complete related paperwork. (TR. 136.)

## ANALYSIS

### 1. Stop of the Vehicle

A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation. *United States v. Andrews* 454 F.3d 919, 921 (8th Cir. 2006) (citation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*. "[I]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of the vehicle." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (quotation omitted).

Deputy Johnson had probable cause to believe that Defendant committed a traffic infraction. The video of the encounter clearly reflects that Defendant turned into an improper lane and made a lane change without signaling, which are both violations of Nebraska law.[5] (Ex. 2.) Also, as Defendant traveled northbound on Highway 31, he drifted and straddled the line dividing the northbound lane and the turning lane. Moreover, Defendant did not fully enter the turn lane as he turned onto Nebraska Crossing Drive. Deputy Johnson testified that Defendant's turn onto Nebraska Crossing Drive was wide and that Defendant turned into the wrong lane of the road as he turned. Additionally, Defendant did not immediately stop the Equinox when Deputy Johnson activated his overhead lights. It is clear from the evidence presented at the hearing, including the video of the traffic stop, that Deputy Johnson had numerous reasons to conduct a traffic stop. Therefore, the stop of the Equinox was constitutionally permissible.

---

[4] Deputy Miller could not recall if he saw a beer can during his inventory search of the Equinox, but he does recall Deputy Johnson telling him on the scene that he found a beer can. (TR. 106.) The Court will note that a beer can was never flashed in front of a camera in this case. (Ex. 3.)

[5] Deputy Johnson testified that he stopped Defendant for failure to signal a lane change in violation of Neb. Rev. Stat. 60-6,6161(2).

5

### 2. Detention of Defendant

"When an officer makes a routine traffic stop, the officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially promoted the stop." *Lyons*, 486 F.3d at 371 (internal quotation omitted). An officer may detain a motorist "while the officer completes certain routine tasks related to the traffic violation, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history." *Id*. However, an officer cannot continue to detain a motorist after a traffic stop is completed unless the officer has "a reasonably articulable suspicion for believing that criminal activity is afoot." *Id*. (internal quotation omitted). Reasonable suspicion "requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010). "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *Id*.

As previously discussed, Deputy Johnson had probable cause to stop Defendant for a traffic violation. While in the process of completing the routine tasks relating to the traffic stop, Deputy Johnson developed reasonable suspicion of illegal activity sufficient to detain, as well as probable cause to eventually arrest, Defendant. *See United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) ("Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it").

Deputy Johnson, an officer experienced in investigating and arresting individuals for driving under the influence of alcohol, testified that he believed Defendant was under the influence of alcohol. Deputy Johnson stated that when Defendant got out of the Equinox, he was swaying and did not appear to have very good balance. Deputy Johnson could smell the odor of an alcoholic beverage on Defendant's breath and noticed that Defendant had bloodshot and glassy eyes. Deputy Johnson also noticed that Defendant's speech was slurred. Between dispatch and the running Defendant's name through NCJIS, Deputy Johnson learned that

Defendant was a convicted felon, was currently on supervised release, and had two prior DUIs. Deputy Johnson gave Defendant a preliminary breath test, after waiting the required 15 minutes, and Defendant tested .150, which is over the legal limit. At that point, Deputy Johnson arrested Defendant for driving under the influence. (Ex. 2.) Therefore, Deputy Johnson's detention and ultimate arrest of Defendant was constitutional.

      **3.     Search of the Equinox**

Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v.* Arizona, 437 U.S. 385, 390 (1978) (quotation omitted). "In the case of a warrantless search, the government bears the burden of establishing an exception to the warrant requirement." *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). One of the exceptions to the warrant requirement is the automobile exception, which permits officers to search a vehicle "if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009). Another exception is the search incident to a lawful arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Officers may search a vehicle incident to arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 556 U.S. at 351. The government is claiming both of these exceptions to the warrant requirement apply to this case. Contrary to the government's contention, the totality of evidence demonstrates that neither of these exceptions were applicable at the time the search was conducted.

Deputy Johnson did not have probable cause to believe the Equinox contained evidence of criminal activity at the time he searched it. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). Deputy Johnson removed Defendant from the Equinox, engaged him in a short conversation, and then placed him in handcuffs. Immediately after placing Defendant in handcuffs, Deputy Johnson began searching the vehicle. At the time he began his search,

7

Deputy Johnson had indications that Defendant might be under the influence of alcohol, but Defendant was not under arrest for a crime at the time the search was conducted. Therefore, Deputy Johnson had no reason to believe that evidence of a crime would be found in the Equinox at the time of the search. In fact, Deputy Johnson admitted at the hearing that he did not have probable cause to search the Equinox. Therefore, the Court concludes that the automobile exception does not justify the warrantless search.

Similarly, the search incident to arrest exception does not apply. Defendant had not been arrested at the time the search occurred. Although Defendant had been stopped for a traffic violation, it was not an offense for which he could be arrested and jailed. Because Defendant was not under arrest, Deputy Johnson had no reason to suspect the Equinox contained evidence of a crime at the time of the search.[6] In fact, there is no indication that the Equinox was searched because of a belief that it contained evidence related to Defendant's driving under the influence. Deputy Johnson testified that he was searching the vehicle for Defendant's wallet. Moreover, even if one could find that Defendant was under arrest at the time the search occurred, Defendant was handcuffed, away from the Equinox, and guarded by another deputy when Deputy Johnson began his search. There was no concern for officer safety or any danger that evidence could be destroyed. *See Gant*, 556 U.S. at 339 (stating that the search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations"). Therefore, the search incident to arrest exception to the warrant requirement is inapplicable.

Because no exception to the warrant requirement applies, the warrantless search of the Equinox violated the Fourth Amendment.

### 4. Inevitable Discovery

Even though the warrantless search of the Equinox violated the Fourth Amendment, the evidence found in the vehicle may still be admissible if the government can show it would have

---

[6] The Court notes that it may have been reasonable to search the Equinox for evidence relevant to Defendant's intoxication once the officers arrested Defendant for DUI.

been inevitably discovered. *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013). If the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received. *Nix v. Williams*, 467 U.S. 431, 444 (1984). For the inevitable discovery exception to apply, the government must show "(1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *Allen*, 713 F.3d at 387. When applying the inevitable discovery doctrine, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1019 (8th Cir. 2003).

The record in this case shows that there is a reasonable probability that the firearm and other evidence in the Equinox would have been discovered during an inventory search performed after Defendant's arrest for driving under the influence. "Inventory searches may be conducted without a warrant or probable cause to search, so long as they are reasonable under the totality of the circumstances." *Allen*, 713 F.3d at 387 (internal citation omitted). "Inventory searches that are conducted according to standardized police procedures are reasonable." *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) (internal quotation omitted). In the context of an inventory search, the government bears the burden to "produce evidence that impoundment and inventory search procedures were in place and that law enforcement complied with those procedures." *Kennedy*, 427 F.3d at 1144. "Adherence to standardized procedures is necessary to ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence, since inventory searches are often conducted in the absence of the safeguards of a warrant and probable cause." *Id.* at 1143 (internal quotation omitted).

Deputy Miller testified that he was in charge of the towing and disposition of the Equinox following Defendant's arrest. As part of the procedure for arresting an individual for driving under the influence and towing of that individual's vehicle, Deputy Miller was required, per the policy of the Sarpy County Sheriff's Office, to conduct an inventory search. (TR. 79, 94; Ex. 4;

9

Ex. 5.) Pursuant to policy of the Sarpy County Sheriff's Office, inventory searches include an inspection of all areas of the vehicle, including under the seats. (TR. 79,94; Ex. 4; Ex. 5.)

Although Deputy Miller did not list the firearm in the "Property Removed from vehicle" section of the Tow/Impound Form, this omission does not invalidate the inventory search because Deputy Miller completed an Evidence/Property Form that lists the firearm. The Sarpy County Sheriff's Standard Operating Procedure for towing a vehicle provides:

> If contraband is found in a vehicle during an inventory search, the deputy shall process the evidence according to Sheriff's Office policy (see G-10300 Evidence and Property).

(Ex. 4.) The Sheriff's Office policy G-10300 was not offered at the hearing, but the reference above is to "Evidence and Property," which is similar to the title of the form (Evidence/Property) that lists the gun. In addition, Deputy Miller testified that how he filled out the forms was the way that he was trained. The Court finds that Deputy Miller adhered to the standardized procedures of the Sarpy County Sheriff's Office for the inventory search of Defendant's vehicle in this case. The other mistakes that Deputy Miller testified to were oversights and do not invalidate the inventory search which was required by the policies and procedures of the Sarpy County Sheriff's Office. *See United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) (stating that inventory searches are not necessarily unreasonable when standard procedures are not followed). The Court finds the inventory search that Deputy Miller performed in this case was valid. Therefore, the government has met the first prong of the inevitable discovery doctrine. The firearm and any other evidence would have been found in the inventory search of Defendant's vehicle after he was arrested for driving under the influence.

The government has also met the second prong of the inevitable discovery doctrine. The record demonstrates that the officers were pursuing an alternative line of investigation at the time of the unlawful search. This element of the inevitable discovery doctrine "requires that the government prove that there was, at the time of the search . . . an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained evidence." *United States v. Munoz*, 590 F.3d 916, 923-24 (8th Cir. 2010) (quotation omitted). The record shows

that, at the time of the search, officers suspected that Defendant may have been driving under the influence of alcohol. Deputy Johnson testified that he searched the vehicle to locate Defendant's wallet and, while doing so, observed spilled beer in the console of the vehicle. Notably, Deputy Johnson observed the beer before locating the gun, and there is no indication that Deputy Johnson was searching for a gun or any type of related contraband. Thus, the Court concludes that the officers were pursing an alternative line of investigation at the time of the search (driving under the influence) and that the evidence found in the Equinox is admissible under the inevitable discovery exception.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress Evidence ([Filing No. 21](Filing No. 21)) be denied.

DATED December 1, 2017.

BY THE COURT:

S/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.